UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X   Docket No.: 09-CV-2964
LESLIE DRUCKER,                                                                              (GBD)(DFE)

Plaintiff,

-against-                                      **AMENDED COMPLAINT AND
                                                JURY DEMAND**

THE CITY OF NEW YORK and THE DEPARTMENT OF
EDUCATION OF THE CITY OF NEW YORK,

Defendants.

---------------------------------------------------------------------X

Plaintiff, by her attorneys. Gabor & Gabor. as and for her Complaint and Jury Demand.

respectfully alleges as follows:


## PARTIES

1.      At all times relevant hereto. plaintiff, Leslie Drucker, was and is a resident and

domiciliary of the State of New York, County of New York with her principal residence located

at 160 Bleecker Street. New York. New York 10012.

2.      At all times relevant hereto. defendant. The City of New York is a municipality

with its principal offices located at 100 Church Street, New York City. New York 10007.

3.      At all times relevant hereto, defendant The Department of Education of the City

of New York is a public entity with its principal offices located at 52 Chambers Street, New

York. New York 10007.

## VENUE AND JURISDICTION

4.      This is a civil rights action brought by the plaintiff in order to redress multiple

deprivations by the defendant of plaintiff's rights secured by the Constitution of the State of New York. as well as pursuant to 42 U.S.C. 2000e et seq.. otherwise known as Title VII of the Civil Rights Act of 1964, the Americans With Disabilities Act: the New York State Executive Law Section 290 et. seq., the New York City Administrative Code; and all applicable rules and regulations.

5.    Jurisdiction is conferred on the Court by 28 U.S.C. 1331 and 28 U.S.C. 1343(a) and under the doctrine of supplemental and pendent jurisdiction.   Venue in the Southern District of New York is appropriate pursuant to 28 U.S.C. 1391 inasmuch as acts and transactions constituting violations of the above Acts have occurred in this District.

6.    The plaintiff served a Notice of Claim on the defendants on May 1, 2008.

7.    The plaintiff filed a complaint with the Equal Employment Opportunity Commission on June 9. 2008.

8.    The plaintiff received a Right to Sue letter dated December 30, 2008.

9.    This action has commenced within ninety (90) days of receipt of the right to sue.

10.    A copy of this federal court complaint has been served upon The New York City Commission on Human Rights and upon Corporation Counsel.

## NATURE OF THE ACTION

11.    This is an action brought for monetary damages for pain, suffering, humiliation, lost wages and other compensation.  This is also an action brought for declaratory. injunctive. equitable and affirmative relief.  Exemplary damages, counsel fees and the costs and expenses to redress the injuries caused by the acts of the Defendant are also sought.

## BACKGROUND AND FACTS

2

12.    The plaintiff was born on June 20, 1961, and is therefore currently forty-seven (47) years of age.

13.    The plaintiff is a Jewish, Caucasian woman.

14.    The plaintiff has suffered from Chondromalacia of the left knee from on or about April 2007 to present.

15.    Chondromalacia made it extremely difficult for the plaintiff to walk, run or climb stairs.

16.    The plaintiff was hired by the defendants in 1994 and she worked for the New York City Department of Education as a Special Education Teacher in District 75, the New York City school district for special needs students.

17.    At that time, the plaintiff's responsibilities consisted of: developing a portfolio based literacy program; teaching high school and middle school curriculum to the severely emotionally disturbed; teaching daily living skills to profoundly mentally retarded students; teaching a socialization program that educated autistic students alongside severely emotionally disturbed students; and individualized instruction for students ages 5 through 21.

18.    The plaintiff received positive annual review reports every year that was employed at District 75.

19.    From 1998 to 1999, the plaintiff worked as a Consultant for the Division of Assessment and Accountability where her responsibilities consisted of: conducting on-site assessments of special needs high school's school to work programs, conducting focus groups, in-depth interviewing, and direct program observations. The plaintiff was also responsible for development of surveys and their data analysis and the review of program content, per New York

3

State Education guidelines. Her research in this area was prepared for publication.

20.    From 2000 to 2005, the plaintiff worked for the defendants in the Chancellor's Office of Special Investigations where her responsibilities included: monitoring investigations conducted by senior staff administrators assigned to schools throughout New York City, conducting regulatory and compliance investigations: performing document analysis pertinent to city and state protocols: analyzing forensic computer reports, interviewing students. parents. and staff members. while working with union officials and staff attorneys, and preparing final reports for submission to the Chancellor's Office of Legal Services. In addition, the plaintiff conducted investigations of sexual abuse. fraud. and misconduct alleged against Department of Education staff. At the request of the Deputy Director for OSI. the plaintiff observed the New York City Police Department Counter Terrorism Group. and briefly trained with their Computer Crimes Division. The plaintiff was one of two individuals chosen by the Department of Education for computer forensic training and would liaison to the NYPD Computer Crimes Division on behalf of The Department of Education. In addition, the plaintiff worked with the NYPD Manhattan Special Victims Unit, and occasionally with the office of the Manhattan District Attorney. The plaintiff's work resulted in the exoneration, or termination. or incarceration. of numerous Department of Education employees. The plaintiff received positive annual reviews from her supervisors.

21.    In September 2005. the plaintiff was assigned as a Special Education (9th - 12th grade) teacher for Unity Center for Urban Technologies ("Unity"). a New York City public school, located at: 121 Avenue of the Americas, New York. New York 10013.

22.    While employed at Unity. the plaintiff's responsibilities consisted of: focusing on

4

enhanced literacy development for special needs learners. While working at Unity the plaintiff participated in collaborative team teaching in English and Math, as well as teaching separate special education classes for which the plaintiff received positive supervisory review. She was also responsible for collaborative team teaching in Chemistry. Earth Science, History and English as a second language. Additional responsibilities included: Transition Linkage Coordinator for 12th grade students. after-school tutorials for special needs reading and writing skills, administration of Regents Competency Test and New York City Regents examinations, conducting on-going student assessments. preparing Individualized Education Plans (IEPs) and conducting IEP meetings addressing individual student learning styles, developing and finalizing IEP goals with the input of subject area teachers. as well as meeting IEP mandated goals.

23.    On June 13, 2006. the plaintiff received a positive class observation report from Melody Crooks-Simpson, the Assistant Principal of Unity Center.

24.    On June 28, 2006, the plaintiff received a letter from Maritza Tamayo, Principal of Unity regarding the superior job performance of the plaintiff for the 2005/2006 school year.

25.    On October 3. 2006. the plaintiff received a positive class observation report from Ms.Tamayo.

26.    On October 18. 2006. Ms. Tamayo wrote an extremely flattering letter of recommendation for an after-school tutorial position for special needs students. to which the plaintiff was applying.

27.    On October 23, 2006 a female student  in the plaintiff's school intentionally exposed her breast. As a result, the plaintiff filed a Dean's report concerning the student's inappropriate actions. The student became extremely angry and began to shout and curse at the

5

plaintiff. The plaintiff was reprimanded by Ira Simmonds, an Assistant Principal, who gestured angrily for the plaintiff calling her to his office where he berated and humiliated her stating amongst other things, that she was the worst teacher at the school.. Mr. Simmonds wrote a disciplinary memo in the plaintiff's file which stated that the plaintiff was "inappropriate" and "unprofessional" in the manner in which she disciplined the student.

28.     On October 24, 2006, the plaintiff met with Maritza Tamayo, the Principal of Unity Center, and Susan Balstad , the UFT Representative, to inform them that the October 23, 2006 memo was filled with falsehoods and misrepresentations. Ms. Tamayo concluded that the memo written by Simmonds contained false allegations.

29.     On November 15, 2006, the plaintiff received a positive class observation report from Mr. Simmonds.

30.     On May 30, 2007, the plaintiff attended a conference in Mr. Simmonds' office regarding a special education student, with the student's mother, a Parent Coordinator, and a Social Worker discussing the student's upcoming move to Pennsylvania.

31.     On June 4, 2007, the plaintiff received a memo from Mr. Simmonds in which he stated that the plaintiff was inappropriate and implied that she was a racist.

32.     On June 6, 2007, the plaintiff met with Ms. Tamayo. Ms. Balstad, and Mr. Simmonds regarding his June 4. 2007 memo.  Mr. Simmonds was not able to support any of his accusations.

33.     On June 12, 2007, the plaintiff requested to file a Special Complaint with the UFT and the LEOC regarding Ira Simmonds' harassment.

34.     On June 18. 2007, the UFT decided to pursue the Special Complaint on the

6

plaintiff's behalf.

35.     On or about June 26, 2007, the plaintiff filed a Special Complaint with the Chancellor regarding Mr. Simmonds' harassment of the plaintiff.

36.     On June 28, 2007 the plaintiff informed Ms. Tamayo that there were IEP folders missing for some of the Special Education students.

37.     On July 13, 2007, the plaintiff was cutoff from her salary for the summer school session.

38.     On July 16, 2007, Elena Brito, Mr. Simmonds' Administrative Trainee, entered the plaintiff's class and began bothering one of her special needs students. The plaintiff took Brito. into the hallway and explained that the manner in which she treated the student was very detrimental to him due to his learning problems. Brito responded by getting very hostile and cursing at the plaintiff.

39.     On July 16, 2007, after working for approximately four (4) hours that day, the plaintiff was informed by Mr. Simmonds, in front of the school's staff, that as per Ms. Tamayo's instruction of the previous week, the plaintiff was terminated from working during the summer session.

40.     On July 17, 2007, the plaintiff asked Ms. Tamayo why she was terminated from the Summer cession. Ms. Tamayo responded that the plaintiff was not terminated and that she never instructed Mr. Simmonds to terminate the plaintiff.

41.     On July 17, 2007, Elena Brito wrote the plaintiff a threatening letter.

42.     On July 18, 2007, after the plaintiff had been working for two (2) weeks, Tamayo wrote a letter stating that the plaintiff's summer session hours had been removed due to budget

7

restraints.

43.     On July 18, 2007, Ms. Tamayo wrote an outstanding letter of recommendation on the plaintiff's behalf.

44.     On July 20, 2007, while picking up the recommendation, the plaintiff advised Tamayo that Simmonds and Brito had been harassing her. While Tamayo acknowledged the harassment, she did not indicate that she would take any action.

45.     The plaintiff also spoke with William Brewton, an Investigator with the Office of Equal Opportunity on July 20, 2007 regarding the plaintiff's harassment claims.

46.     On July 23, 2007, the plaintiff received an e-mail from Susan Balstad, the UFT representative for Unity which stated her perception of Mr. Simmonds' hostility towards the plaintiff and his constant "picking on" her.

47.     On or about July 23, 2007, the plaintiff wrote a letter in response to Ms. Brito's July 17, 2007 letter.

48.     On July 26, 2007, a meeting was scheduled to be held and attended by Mr. Brewton, Ms. Tamayo, Mr. Simmonds, and the plaintiff to discuss the plaintiff's harassment claims.  The plaintiff was not informed of this meeting until well after it had been scheduled.

49.     On July 30, 2007, the plaintiff informed Frank Volpicella, Jerry Goldman, Tom Dromgoole, and Ymelda Joson (all UFT representatives), that she declined to attend the Brewton meeting because she was not permitted to have union representation at the meeting.

50.     On July 31, 2007, the Office of Equal Opportunity concluded that Mr. Simmonds' statements, in and of themselves, did not violate her civil rights.

51      On August 6, 2007, Mr. Simmonds wrote a letter to the plaintiff regarding the

8

July 31, 2007 decision and stated that she would be contacted by Mr. Simmonds' attorney in order to bring a lawsuit against her and that Unity would be requesting that the DOE have her undergo a psychiatric evaluation.

52.    In or about the second week of August, 2007, Ms. Tamayo was removed from her position as Principal of Unity because she was practicing "Santeria" on school property.

53.    On or around August 23, 2007, Mr. Simmonds called staff members at their homes during the staff's summer vacation, to inform them of an August 29, 2007 staff meeting.

54.    On August 27, 2007, the plaintiff was informed that the August 29, 2007 staff meeting was cancelled because Mr. Simmonds never got approval from the Superintendent for the staff meeting, and that he circumvented proper protocol, even though Mr. Simmonds falsely stated that he did receive approval for the meeting.  A union representative was present at the September 4, 2007 administrative meeting because of this misrepresentation.

55.    On August 27, 2007, the plaintiff was informed that the new Principal for Unity would be Fausto De La Rosa.

56.    On August 29, 2007, the plaintiff sent an e-mail to Jerry Goldman regarding the UFT's investigation of her claim against Mr. Simmonds for harassment.  The plaintiff informed Mr. Goldman that she had spoken with three attorneys at the Department of Education, as well as Elaine Gorman, former Superintendent, regarding the harassment.  The following day, August 30, 2007, Mr. Goldman told the plaintiff that he would investigate the matter.

57.    Immediately prior to the beginning of the 2007-2008 school year, the plaintiff received a telephone call from former Unity Superintendent Elaine Gorman requesting that she send her copies of all letters that she had received from Ira Simmonds.  The plaintiff complied

with Ms. Gorman's request.

58.    On September 6 & 7, 2007, the plaintiff requested to file a second Article 23 Special Complaint with the UFT regarding Mr. Simmonds' continuing harassment which occurred since she filed the first Special Complaint.

59.    On September 10. 2007, Randi Weingarten. the Head of UFT, came to Unity with Tom Dromgoole, Carmen Alvarez and Walter O'Leary to address problems staff was having with the administration.

60.    In or about the week of September 24, 2007, the plaintiff requested a set of keys for her classroom (Room 406) from Mr. De la Rosa, who said that he would get back to her and never did.

61.    On October 3, 2007, Jeff Huart. UFT confirmed that the plaintiff's June 2006 harassment complaint was still going forward with the UFT.

62.    On October 3. 2007, the plaintiff requested Ms. Joson's assistance in requesting a transfer due to the way she was being treated.

63.    On October 4. 2007. the plaintiff informed Ms. Joson that she was assigned an unreasonable amount of administrative duties. in addition to her Special Education classes, by Mr. De la Rosa and Dr. Ronald Wells.

64.    Dr. Wells demanded that the plaintiff change IEP reports that had been prepared by Roscio Garcia, the Unity Scheduling Programmer and approved by Mr. Simmonds the prior year.

65.    When the plaintiff informed Dr. Wells that she had not written the original documents, and that therefore. she could not make the requested changes, he told the plaintiff

that he would give her one month to make the document changes.

66.    The plaintiff asked Ms. Joson if she could file a grievance and was informed that Dr. Wells violated the teacher contract.

67.    On October 4, 2007, the plaintiff informed Susan Balstad that Mr. De la Rosa asked her to "fix" IEP reports that had been "doctored" by Mr. Simmonds and Ms. Garcia, an un-certified Special Education teacher.

68.    On October 5, 2007, the plaintiff informed Ms. Joson of Dr. Wells' and Mr. De la Rosa's demand to change the "doctored" IEPs.

69.    On October 5, 2007, Mr. Goldman informed the plaintiff that he met with Elaine Goldberg, former Superintendent and CEO of the ISO (supervising organization) of Unity at the time, and James Machen, Superintendent of District 13 and the Senior Achievement Facilitator of Unity, to discuss the Wells situation.

70.    On October 9, 2007, Dr. Wells told the plaintiff that she was not entitled to the same prep time as the rest of the staff because she was a Special Education teacher. All teachers are entitled to one (1) prep period per day.    Prior to this time, the plaintiff was allotted one (1) prep period a day, five (5) times a week.

71.    On October 9, 2007, the plaintiff responded to Mr. Goldman's October 5th e-mail and informed him of what Dr. Wells said earlier that day. The plaintiff copied Mr. Huart, Ms. Balstad, and Ms. Weingarten on her e-mail to Mr. Goldman. Mr. Goldman responded to her e-mail stating that he had a team of people working on it.

72.    On of October 10, 2007, the plaintiff spoke with Carmen Alvarez, UFT, regarding the complaints made to the union concerning Unity's Special Education program, specifically

Mr. De la Rosa's and Dr. Wells' requests to change the IEP's.

73.    On October 10, 2007, Ms. Joson sent an e-mail to all staff stating that a memorandum regarding bulletin boards given by Mr. De la Rosa earlier that day violated the UFT contract.

74.    On October 10, 2007, the plaintiff sent an e-mail to Mr. De la Rosa further addressing her concerns with the request to change "doctored" IEPs, as well as, an incident which the plaintiff was asked to sign off on a factually deficient Special Education placement, that neither the plaintiff nor the student's guardian had input on. The plaintiff forwarded the e-mail to Ms. Alvarez and Walter O'Leary, UFT, the following day.

75.    On October 11, 2007, the plaintiff asked Ms. Joson, for the second time, for a set of keys to her classroom.

76.    On October 12, 2007, as per Ms. Alvarez's request, the plaintiff sent her a copy of IEP overview information she had regarding Unity's Special Education program.

77.    On October 14, 2007, the plaintiff advised Ms. Joson that Mr. De la Rosa had still not given her a key to her room.

78.    On October 16, 2007 the plaintiff requested that Mr. Simmonds provide her with security because some of the inappropriately placed special needs students loudly and aggressively exploded during her class.    Mr. Simmonds ignored the plaintiff's requests and it was not until the situation intensified that security came on their own to assist the plaintiff.

79.    On October 17, 2007, the plaintiff filed two UFT safety reports, to wit:, not being given a key and being locked out with students for a full class period and the placement of special education students at Unity whose IEP demanded they be placed in special schools. The

12

plaintiff informed Ms. Joson of the reports.

80.    On October 18, 2007. Mr. De la Rosa told the plaintiff that he wanted the "doctored" IEPs changed, and that it didn't matter because no one read them anyway.

81.    On or about October 18, 2007 the plaintiff asked the school secretary, Maria Valenti for the Department of Education form to sign for a medically certified sick day.  The plaintiff was absent from work the previous day and was in possession of a doctor's note.  Ms. Valenti advised the plaintiff that there was no form and that she should just give her the note and the plaintiff replied that she was sure there was a form and asked her to check.

82.    Valenti then proceeded to scream and called the plaintiff a "Bitch."  The plaintiff spoke to Principal De la Rosa about the matter and he said he was pretty sure that there was a form and that the plaintiff should obtain one from an outside colleague.

83.    On October 19, 2007, the plaintiff informed Ms. Alvarez that at least two (2) of the IEPs had already been changed by someone other than the plaintiff.

84.    On October 19. 2007, the plaintiff was informed by Mr. Simmonds that her classroom was being replaced with three (3) separate classrooms which would require the plaintiff to carry all of her supplies and teaching aids from one classroom to another.

85.    The plaintiff wound up having to teach in the computer lab as her sole class room.

86.    Prior to the classroom change, Mr. Simmonds and Matt Willie, Dean, used the plaintiff's classroom to conduct meetings which resulted in causing disruption to students. parents and the plaintiff. In addition. they would make snide and inappropriate comments to the plaintiff.

87.    On October 19, 2007. the plaintiff informed Mr. De la Rosa that a student was not

13

receiving the proper treatment that he should have been receiving and that the switch from one classroom to three (3) was inconvenient.

88.     On October 20, 2007. Ms. Joson e-mailed the plaintiff the correct medically certified sick day form.

89.     On October 24, 2007 the plaintiff attended a grievance meeting with Ms. Joson and Principal Dela Rosa regarding the October 11, 2007 incident.

90.     On October 25, 2007, the plaintiff sent an e-mail to Ms. Joson and Principal De la Rosa expressing her concern that the male student involved in the incident on October11, 2007 should be placed in a special school consistent with the directives in his IEP. In addition, the student's mother had a history of aggression towards the plaintiff. Accordingly, the plaintiff informed Ms. Joson and Mr. De la Rosa, that she would like the Parent Coordinator to be present at meetings that the plaintiff had with the student's mother.

91.     On October 26, 2007, the plaintiff had a parent-teacher conference with the students' mother. Mr. De la Rosa did not attend however, Ms. Joson and the Parent coordinator were present. The parent became increasingly aggressive and angry and cursed at the plaintiff. In fear of her safety, the plaintiff requested assistance from security.

92.     On October 27, 2007, the plaintiff filed a complaint with the NYPD regarding the incident. The plaintiff also advised Mr. De la Rosa. Mr. Huart and Sheila Laval, UFT, of the incident.

93.     On October 28, 2007 the plaintiff expressed her concerns to Mr. De la Rosa regarding another student and the decision to place a general education student into special education when clearly the only "problem" with the girl was that her primary language was

Spanish, and probably only needed ESL classes. Also, it seemed there was no request for the student to be evaluated by a parent or guardian.

94.    On October 31, 2007, the plaintiff sent Principal De la Rosa an e-mail stating that four (4) IEP files indicated that students needed to be in special classes and/or special schools and were not. The plaintiff forwarded this e-mail to Mr. Michael Harris, OSI, DOE.

95.    On October 31, 2007, Mr. Simmonds verbally attacked Ms. Joson at a staff meeting.

96.    On November 1, 2007 the plaintiff was assigned to yet another classroom (Room 412). This classroom was by far the worst classroom in the school where students would leave food in the desks that would not be removed by the janitorial staff until the stench was unbearable. The plaintiff did not start using this new classroom until November 13, 2007.

97.    On November 1, 2007, the plaintiff asked Mr. Simmonds if she could use the school's copier. Mr. Simmonds stood up, sneered at the plaintiff and said, "Say please." The plaintiff responded, "Excuse me?" and Mr. Simmonds replied "You heard me, I said, say please." The plaintiff said, "What?". Mr. Simmonds replied, "Say it" at which point the plaintiff said "Never mind." The plaintiff informed Mr. De la Rosa of the incident, and requested that he intervene.

98.    On November 3, 2007, Ms. Joson provided the plaintiff with the appropriate Department of Education website to pursue her harassment claim since the UFT was not following through.

99.    On November 6, 2007, Ms. Joson sent the plaintiff an e-mail stating that a majority of the teachers at Unity were upset with Dr. Wells and Principal De la Rosa for doing

15

whatever they wanted without consulting with the teachers first.

100.    On November 8, 2007, the plaintiff complained to Principal De la Rosa that Mr. Simmonds was telling staff and students that she had made the decision to move into the Computer lab and deny Lab access to students and staff.

101.    The plaintiff was concerned that Simmonds was taking steps to get the faculty and students to become angry with her.

102.    On November 8, 2007, another incident occurred which involved a student threatening the plaintiff. She went into Principal De la Rosa's office and requested assistance. Mr. Simmonds laughed at the plaintiff.

103.    On November 18, 2007, the plaintiff informed Mr. Goldman that she did not expect her grievances to be heard regarding the key and the students being able to fill out their own DOE complaint forms because those issues had been resolved. She also told him that she heard nothing regarding the Special Complaint she filed against Mr. Simmonds, and that he was still harassing her.

104.    On November 23, 2007 Ms. Brito abused the plaintiff. The plaintiff brought this matter to the attention of Principal De la Rosa and the Superintendent. The plaintiff confirmed the incident in an email which was sent to Principal De la Rosa and Superintendent Pena requesting that they intervene inasmuch as the plaintiff felt that things were escalating.

105.    On December 6, 2007, this e-mail was forwarded to the UFT.

106.    On December 2, 2007, the plaintiff sent a memo to staff requesting that they remove their materials from her classroom . She was ordered by Principal De la Rosa to remove the memo and Principal De la Rosa filed a professional misconduct charge against her.

107.    On December 6, 2007, the plaintiff was notified by a letter left on her desk by the Principal advising her that she was expected to attend an investigatory interview scheduled for the following afternoon.

108.    On December 14, 2007, the plaintiff received a disciplinary letter stating that she committed verbal abuse.

109.    On December 16, 2007, the plaintiff requested that Ms. Joson file a grievance regarding the December 14, 2007 letter as it was completely false.

110.    On January 3, 2008, the Unity staff received a memo from Mr. Simmonds regarding fire drill procedures. Immediately after receiving the memo, the plaintiff reminded Principal De la Rosa of her knee condition and how it would prevent her from walking up or down anything other than a few steps.

111.    On January 4, 2008, the plaintiff met with Principal De la Rosa and Ms. Joson to discuss the verbal abuse disciplinary letter.

112.    On January 7, 2008, Ms. Joson informed the plaintiff that she was not comfortable preparing the disciplinary letter grievance she had requested on December 16, 2007.

113.    On January 8, 2008, the plaintiff received a memo from Mr. Simmonds, which was approved by Principal De la Rosa, stating that she was being relieved of all of her Administrative duties, and to focus on the Annual Review.

114.    On January 9, 2008, Unity held a fire drill. The plaintiff carefully instructed her students to use the stairs. The plaintiff then attempted to use the elevator to proceed down because of her medical condition. However, Dr. Wells prevented the plaintiff from using the elevator. During the time that the plaintiff was explaining that she had a medical condition, a

17

pregnant student joined the plaintiff in an attempt to use the elevator. Principal De la Rosa joined the conversation and instructed the plaintiff and the student to use the stairs.

115. Later that day, Principal De la Rosa wrote the plaintiff up to Superintendent Pena stating that she was inappropriate and insubordinate and caused the school to remain outside longer than necessary, impacting the safety of the students. Principal De la Rosa expedited a request to have the plaintiff sent to the New York City Department of Education Medical Unit.

116. On January 9, 2008, the plaintiff informed Principal De la Rosa that she had a complaint with the NYPD against the male student's mother and on January 14, 2008 he was given a copy of the complaint.

117. On January 10, 2008, Mr. De la Rosa submitted a second request that the plaintiff have a Medical Examination. That same day, Superintendent Pena directed a medical examination to determine the plaintiff's mental and/or physical capacity to perform her duties.

118. On January 14, 2008, the plaintiff received a letter from Principal De la Rosa thanking her for informing him about her condition, and asked for a doctor's note before the end of the January 14, 2008 school day.

119. On January 16, 2008, the plaintiff attended a grievance meeting with Principal De la Rosa regarding his verbal abuse complaint.

120. On January 17, 2008, the plaintiff received a letter from Principal De la Rosa regarding their January 4, 2008 meeting in which he concluded that the plaintiff's conduct was unprofessional and that she might receive further disciplinary actions.

121. On January 18, 2008, the plaintiff forwarded Principal De la Rosa a doctor's note regarding her condition.

122.    On January 22, 2008, Principal De la Rosa responded to the plaintiff's doctor's note by stating, "I still expect you to escort your students down the stairs during any and all fire drills."

123.    On January 23, 2008, the plaintiff contacted Donna George, UFT, regarding the situation at Unity.

124.    On January 29, 2008, the plaintiff was informed that she had to report to Medical Administration for a medical exam on February 6, 2008 and that her failure to do so would result in disciplinary action.

125.    On or about January 30, 2008 the plaintiff was notified that there were 3020a charges pending against her however, the letter did not state what the specific charges were.

126.    Effective on or about January 31, 2008, the plaintiff was transferred out of Unity Center due to the 3020a pending charges.

127.    On February 5, 2008, the plaintiff had a medical exam with the New York City Department of Education.  She was instructed to send all medical files and recent exams to them within 21 days.  She complied.

128.    On February 5, 2008, the plaintiff advised Ms. Joson that she was not permitted to pick up her personal belongings from Unity.

129.    On February 28, 2008, the plaintiff met with Mr. De la Rosa, Dr. Wells, and her District Union representative, Mr. Dromgoole to review the allegations of professional misconduct made against the her by staff members as well as allegations of corporal punishment.

130.    On March 2, 2008, the plaintiff wrote letters to the New York City Department of Education informing them of her complaints against Mr. De la Rosa, Dr. Wells, and Mr.

Simmonds.

131.    The plaintiff advised them that she believed this happened to her in retaliation for filing the initial harassment complaints against Mr. Simmonds and the fact that she is Jewish and a female.

132.    On March 17. 2008. the plaintiff received a letter from Mr. De la Rosa regarding the February 28. 2008 meeting wherein Mr. De la Rosa concluded that there was no evidence that the plaintiff touched, hit. or pushed the student.  However, Mr. De la Rosa also concluded that the plaintiff was unprofessional towards students and staff and advised her that she must refrain from using profanity and other unprofessional conduct on the school premises.

133.    On March 20, 2008. the plaintiff received a letter from The New York City Department of Education informing her that the "ADA states that an individual with an impairment....is entitled to a reasonable accommodation to assist that individual in performing the essential functions of (their) job."

134.    On March 28, 2008, the plaintiff had surgery on her left knee, which, according to the surgeon, would take up to a year to recover from. and could only help with her condition and not cure it.

135.    On April 17, 2008. the plaintiff was notified that her June 26, 2007 complaint against Mr. Simmonds was being addressed and that the hearing for the complaint was scheduled for May 2. 2008.

136.    The plaintiff was informed that the joint DOE/UFT hearing regarding the Special Complaint was going to be held on May 2, 2008 at Unity.  Mr. Simmonds informed all attending, via e-mail, that the plaintiff and Ms. Tamayo were reassigned.

137.    On May 2, 2008, the plaintiff arrived for the hearing at Unity and was met by a Security guard told her that Dr. Wells did not want to talk to her and the hearing was cancelled.

138.    Principal De la Rosa also told the plaintiff that he hearing was cancelled. The plaintiff requested something in writing regarding this, so that she would not be held accountable to the Department of Education for not showing up.  Principal De la Rosa handed the plaintiff a copy of her 3020a reassignment letter.

139.    The plaintiff has yet to hear a decision to the joint DOE/UFT hearing regarding the Special Complaint.

140.    On June 9, 2008, the plaintiff filed a Complaint against defendant with the EEOC.

141.    On July 18, 2008, less than forty (40) days after filing a Complaint with the EEOC, the plaintiff was notified that she was placed on the Department of Education's Ineligible/Inquiry List, making it impossible for her to teach.

142.    The Department of Education did not inform the plaintiff as to why she was placed on the Ineligible/Inquiry List.

143.    In September 2008, Francseca Pena, High School Superintendant, requested a meeting with plaintiff to discuss SCI Case# 2008 - 0589, the reason why the plaintiff was placed on the Ineligible List.

144.    The plaintiff was only informed of the basis of this charge during the September meeting with Pena.

145.    Defendant's SCI Case# 2008-0589 was filed against plaintiff on June 24, 2008, approximately two (2) weeks after filing with the EEOC.

146.    The basis for defendant's charge is that plaintiff informed a student's group home

that a student reported to her that said student felt a teacher was touching the student inappropriately and saying things to her that made her feel uncomfortable. As the defendant found there was nothing to substantiate the student's complaints, the plaintiff was now not permitted to teach because she reported the child's claims and inadvertently informed the child's group home of the complaint.

147.    At the meeting with the Francesca Pena in September 2008, the plaintiff informed her that she could prove that these allegations were false and that she did nothing wrong. The plaintiff submitted a written response to her, refuting the allegations.

148.    Pena was dismissive to the plaintiff, and, to date, the plaintiff remains in the Reassignment Center.

149.    At the Reassignment Center where the plaintiff is stationed, there are approximately two hundred (200) other teachers who are awaiting a decision on their pending charges.

150.    On February 5, 2009, one of the other teachers at the Reassignment Center became verbally aggressive towards the plaintiff, causing her to be legitimately concerned for her safety.

151.    Immediately after the February 5, 2009 incident, the plaintiff reported it to various individuals, including defendant's Human Resource Department. To date, all of the plaintiff's requests for assistance from defendant regarding her safety have been ignored.

152.    The plaintiff has been threatened on several other occasions.

153.    Despite repeated requests, the defendant has failed and refused to properly investigate plaintiff's claims.

154.    The resolution of the claims brought by and against the plaintiff have been delayed in retaliation for plaintiff's complaints of discrimination.

## AS AND FOR A FIRST CAUSE OF ACTION
## TITLE VII - RETALIATION

155.    The plaintiff repeats, reiterates and realleges the allegations contained in paragraphs "1" through "155" with the same force and affect as if more fully set forth herein.

156.    The plaintiff had a good faith belief that the defendant has discriminated against the plaintiff on the basis of her gender and religion.

157.    The plaintiff was subjected to a hostile work environment which manifested itself in adverse actions and denial of career advancement.

158.    The plaintiff complained of this discrimination to many parties under the control of the defendant. and, as a result was the victim of adverse employment action and retaliation.

159.    The plaintiff has been caused to suffer severe emotional and economic damages as a result of this conduct.

160.    But for the plaintiff's complaints of discrimination concerning her gender and religion. the plaintiff would not have been retaliated against in violation of Title VII

161.    As a result of the defendant's conduct, plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

## AS AND FOR A SECOND CAUSE OF ACTION
## NEW YORK STATE EXECUTIVE LAW - RETALIATION

162.   The plaintiff repeats, reiterates and realleges the allegations contained in paragraphs "1" through "162" with the same force and affect as if more fully set forth herein.

163.   The plaintiff had a good faith belief that the defendant has discriminated against the plaintiff on the basis of her gender and religion.

164.   The plaintiff was subjected to a hostile work environment which manifested itself in adverse actions and denial of career advancement.

165.   The plaintiff complained of this discrimination to many parties under the control of the defendant, and, as a result was the victim of adverse employment action and retaliation.

166.   The plaintiff has been caused to suffer severe emotional and economic damages as a result of this conduct.

167.   But for the plaintiff's complaints of discrimination concerning her gender and religion, the plaintiff would not have been retaliated against in violation of the New York Sate Executive Law.

168.   As a result of the defendant's conduct, plaintiff has been damaged in the sum of FIVE MILLION ($5.000,000.00) DOLLARS.

## AS AND FOR A THIRD CAUSE OF ACTION
## NEW YORK CITY ADMINISTRATIVE CODE - RETALIATION

169.   The plaintiff repeats. reiterates and realleges the allegations contained in paragraphs "1" through "169" with the same force and affect as if more fully set forth herein.

170.   The plaintiff had a good faith belief that the defendant has discriminated against the plaintiff on the basis of her gender and religion.

24

171.    The plaintiff was subjected to a hostile work environment which manifested itself in adverse actions and denial of career advancement.

172.    The plaintiff complained of this discrimination to many parties under the control of the defendant, and, as a result was the victim of adverse employment action and retaliation.

173.    The plaintiff has been caused to suffer severe emotional and economic damages as a result of this conduct.

174.    But for the plaintiff's complaints of discrimination concerning her gender and religion, the plaintiff would not have been retaliated against in violation of the New York City Administrative Code.

175.    As a result of the defendant's conduct, plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

## AS AND FOR A FOURTH CAUSE OF ACTION
## THE AMERICANS WITH DISABILITY ACT-RETALIATION

176.    The plaintiff repeats and reiterates and realleges each and every allegation contained in paragraphs "1" through "176" of the Complaint as if more fully set forth herein.

177.    The plaintiff suffered from a disability as defined by the Americans With Disabilities Act. The plaintiff  suffers from Chondromalacia of the left knee.

178.    The plaintiff had a good faith belief that the defendant has discriminated against the plaintiff on the basis of her disability.

179.    The plaintiff was subjected to a hostile work environment which manifested itself in adverse actions and denial of career advancement.

25

180. The plaintiff complained of this discrimination to many parties under the control of the defendant, and. as a result was the victim of adverse employment action and retaliation.

181. The plaintiff has been caused to suffer severe emotional and economic damages as a result of this conduct.

182. But for the plaintiff's complaints of discrimination concerning her gender and religion, the plaintiff would not have been retaliated against in violation of the Americans with Disabilities Act.

183. As a result of the defendant's conduct, plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

## AS AND FOR A FIFTH CAUSE OF ACTION
## THE NEW YORK STATE EXECUTIVE LAW-RETALIATION

184. The plaintiff repeats and reiterates and realleges each and every allegation contained in paragraphs "1" through "184" of the Complaint as if more fully set forth herein.

185. The plaintiff suffered from a disability as defined by the New York State executive Law. The plaintiff suffers from Chondromalacia of the left knee.

186. The plaintiff had a good faith belief that the defendant has discriminated against the plaintiff on the basis of her disability.

187. The plaintiff was subjected to a hostile work environment which manifested itself in adverse actions and denial of career advancement.

188. The plaintiff complained of this discrimination to many parties under the control of the defendant. and, as a result was the victim of adverse employment action and retaliation.

26

189.    The plaintiff has been caused to suffer severe emotional and economic damages as a result of this conduct.

190.    But for the plaintiff's complaints of discrimination concerning her gender and religion, the plaintiff would not have been retaliated against in violation of the New York State Executive Law.

191.    As a result of the defendant's conduct. plaintiff has been damaged in the sum of FIVE MILLION ($5.000,000.00) DOLLARS.

## AS AND FOR A SIXTH CAUSE OF ACTION
## THE CITY OF NEW YORK ADMINISTRATIVE CODE-RETALIATION

192.    The plaintiff repeats and reiterates and realleges each and every allegation contained in paragraphs "1" through "192" of the Complaint as if more fully set forth herein.

193.    The plaintiff suffered from a disability as defined by the City of New York Administrative Code.  The plaintiff  suffers from Chondromalacia of the left knee.

194.    The plaintiff had a good faith belief that the defendant has discriminated against the plaintiff on the basis of her disability.

195.    The plaintiff was subjected to a hostile work environment which manifested itself in adverse actions and denial of career advancement.

196.    The plaintiff complained of this discrimination to many parties under the control of the defendant, and, as a result was the victim of adverse employment action and retaliation.

197.    The plaintiff has been caused to suffer severe emotional and economic damages as a result of this conduct.

198.    But for the plaintiff's complaints of discrimination concerning her gender and religion, the plaintiff would not have been retaliated against in violation of the City of New York Administrative Code.

199.    As a result of the defendant's conduct, plaintiff has been damaged in the sum of FIVE MILLION ($5.000,000.00) DOLLARS.

## JURY DEMAND

200.    Plaintiff demands a jury trial of this action.

**WHEREFORE**, Plaintiff demands judgment as follows:

a)    Declaring that the actions, patterns and practices of the defendant, its agents, servants and all those acting in concert with them. constituted, and does constitute, a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq.; as amended, the Civil Rights Act of 1991 (Pub. L. 102-166); the Americans With Disabilities Act; the New York State Constitution; the New York State Executive Law Section 290 et seq.; the New York City Administrative Code § 8-107 et seq., and all applicable rules and regulations, and common law principals.

b)    Permanently enjoining the defendant, its agents, servants and all those acting in concert with them. from violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq.; as amended, the Civil Rights Act of 1991 (Pub. L. 102-166); the Americans With Disabilities Act; the New York State Constitution; the New York State Executive Law Section 290 et seq.; the New York City Administrative Code § 8-107 et seq., and all applicable rules and regulations, and common law principals.

     c)       Awarding damages for economic and emotional injuries as well as interest, costs,

disbursements, common law, statutory, compensatory, exemplary and punitive damages, pre-

judgment interest, pecuniary and non-pecuniary damages and such other and further relief as to

this Court deems just and proper; and

     d)       Awarding counsel fees, costs and disbursements of this action.

Dated: Garden City, New York
       April 21, 2009

                         Yours etc.,

                         DAVID G. GABOR (DGG 9979)
                         GABOR & GABOR
                         Attorneys for Plaintiff
                         400 Garden City Plaza
                         Suite 406
                         Garden City, New York 11530
                         (516) 248-2525